UNITED STATES DISTRICT COURT

DISTRICT OF OREGON


UNITED STATES OF AMERICA,                                      CR 05-326-RE

        Plaintiff,                                            OPINION AND ORDER

    v.

TROY MOHR,

        Defendant.

---

REDDEN, Judge:

    Before the court is Defendant's Motion (doc. 116) to Dismiss the Indictment for Violation of Ethical Rules and Constitutional Rights, and his Motion (doc. 144) to Suppress Statements to Government Informants. For the reasons set forth below, the motions are DENIED.

## Factual Background

    Defendant Troy Mohr was indicted along with several Portland area "secondhand" merchandise dealers for conspiracy to transport stolen property in interstate commerce in violation of 18 U.S.C. § 2314, and money laundering in violation of 18 U.S.C. § 1956. This case

PAGE 1 - OPINION AND ORDER

is related to, and stems from the FBI's earlier investigation of two Portland "fencing" organizations for knowingly buying and selling stolen retail merchandise from "boosters." During the course of that investigation, several suspected boosters told the FBI that they sold stolen merchandise to several Portland area secondhand dealers. Following the FBI's investigation and prosecution of the two fencing organizations, the FBI expanded its investigation into the Portland "secondhand stores" market. In January 2004, FBI informants began conducting hundreds of undercover purchases and sales of large quantities of stolen merchandise at several Portland secondhand stores. FBI informants recorded many, if not all, of the undercover transactions at targeted secondhand stores.

From August 2002 to September 2004, Mohr was an employee of Kwik Way Cash Store ("Kwik Way"), one of the several secondhand stores targeted by the FBI. In November 2003, Immigration and Customs Enforcement (ICE) raided Kwik Way, and discovered several distinctive outdoor jackets that ICE believed were stolen from a customs-bonded warehouse. The day after the ICE raid, Mohr searched Kwik Way's security records, located a photograph of the suspected seller of the stolen jackets, and forwarded it to ICE Agent Guy Gino. Two weeks later, Mohr again contacted Agent Gino to report that the seller of the stolen jackets had come into the store. Mohr also gave Agent Gino the suspect's license plate number and description.

In April 2004, Mohr retained Laurie Shertz as counsel. Shortly thereafter, Shertz contacted Assistant United States Attorney (AUSA) Scott Kerin about the ICE investigation. AUSA Kerin confirmed that ICE was investigating a warehouse burglary, and that ICE found some of the goods stolen from the warehouse at Kwik Way. AUSA Kerin also indicated that Mohr was not the "main" target , but rather the "number 2 guy at the store." Shertz Dec. in

Support of Mot. to Dismiss, at ¶ 2.

On April 8, 2004, ICE Agent Gino called Mohr about the ICE investigation. Agent Gino also asked Mohr about stolen bicycle parts at Kwik Way. In response to Agent Gino's inquiries, Shertz called both AUSA Kerin and Agent Gino and told them that she was representing Mohr, and that they should not contact Mohr except through Shertz's office.

In June 2004, Shertz contacted AUSA Kerin to communicate Mohr's interest in cooperating with the government. Shortly thereafter, Shertz was forced to take early maternity leave, and told AUSA Kerin that she could not accompany Mohr during any proffer until late August or September 2004. AUSA Kerin assured Shertz that he would take "no further steps against Mohr" until she returned from maternity leave. Shertz Dec., at ¶ 7. Later that day, however, Agent Gino again called Mohr about stolen goods at Kwik Way. In response to Agent Gino's call, Shertz again told AUSA Kerin and Agent Gino not to contact Mohr about the Kwik Way investigation except through her office. On September 15, 2004, Mohr quit working for Kwik Way.

On September 20, 2004, AUSA Kerin sent Shertz a standard proffer letter, which read in pertinent part:

> Because the United States Attorney's Office (USAO) must first evaluate whether your client is prepared to be entirely truthful and cooperative, it is necessary for your client to proffer information . . . which discloses the nature and scope of the criminal activities of others, including the extent of your client's own potential involvement in those activities.

Shertz Dec., Ex. 5, at 1. The letter expressly provides that the United States makes no promises of consideration or any concessions in exchange for Mohr's proffer. The letter also makes clear that the United States cannot use statements or information obtained during the proffer session

PAGE 3 - OPINION AND ORDER

against Mohr in any subsequent trial against him. The United States may, however, make derivative or collateral use of such information.

On October 4, 2004, Mohr and Shertz met with AUSA Kerin, ICE Agent Gino, and Portland Police Bureau Detective Dan Slaussen pursuant to the parties' September 2004 Proffer Agreement. During the proffer session, Agent Gino and Detective Slaussen asked Mohr several questions about his duties as an employee at Kwik Way, as well as his participation in the sale of merchandise on eBay. Mohr explained the day-to-day operations of the store, including the store's "process" and policies for purchasing and reselling merchandise that would come in "off the street." Shertz Dec., at ¶¶ 13-46. Mohr and the detectives discussed some of the regulars that came into the shop to buy and sell merchandise, as well as the store's process for determining what and how much of a particular product the store would buy from a customer. Mohr explained that he quit working for Kwik Way in September 2004 because he became suspicious that the store's owner, co-defendant Mark Linn, was routinely purchasing and selling stolen merchandise. Shertz asserts that Detective Slaussen then confronted Mohr, and accused him of lying about his own involvement in buying and selling stolen merchandise at Kwik Way.

At the end of the proffer session, the parties discussed the possibility of continuing the proffer session another day. In December 2004, AUSA Kerin apparently told Shertz that Mohr was not the "focus" of the government's investigation, and that "no attempts are being made to contact him." Shertz Dec., at ¶ 42. Mohr and Shertz had no further contact with the United States regarding the secondhand stores investigation until August 2005, when FBI Agent Frazier asked Mohr turn himself in to the U.S. Marshall for arraignment on the present indictment.

Mohr now moves to dismiss the indictment based on the government's alleged violations

of the ethical rules prohibiting lawyers from communicating, or causing others to communicate with a represented party.  Alternatively, Mohr seeks an order suppressing any statements made by Mohr to government agents or informants from April 2004, when Mohr retained Shertz as counsel, through the November 2004 proffer session.

### Legal Standards for Dismissal

A district court has "supervisory powers," which permit the court to supervise the "administration of justice" in order to deter "illegal conduct," and to protect "judicial integrity." United States v. Lopez, 4 F.3d 1455, 1463 (9th Cir. 1993) (citing United States v. McClintock, 748 F.2d 1278, 1285-86 (9th Cir. 1984)).  Indeed, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. 153, 160 (1988).  To preserve judicial integrity, a district court may exercise its supervisory powers to dismiss an indictment based on ethical misconduct.  United States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993); McClintock, 748 F.2d at 1285-86.

Nevertheless, the court's power to dismiss an indictment for ethical misconduct is "rarely invoked." United States v. Samango, 607 F.2d 877, 881 (9th Cir. 1979).  Indeed, dismissal of an indictment is "the most severe sanction possible." United States v. Isgro, 974 F.2d 1091, 1098 (9th Cir. 1993); see also Lopez, 4 F.3d at 1464 (dismissal of an indictment for a prosecutor's ethical violations is an "extreme remedy").  Even if the court finds that a prosecutor violated an ethical duty, dismissal of the indictment is "justified only when the government's conduct substantially prejudiced the defendant and the government flagrantly disregarded the limits of professional conduct." Lopez, 4 F.3d at 1464; see also United States v. Larrazolo, 869 F.2d

1354, 1358 (9th Cir. 1989) ("[A] defendant must be actually prejudiced in order for the court to invoke its supervisory powers to dismiss an indictment for prosecutorial misconduct."). Where there is no showing of substantial prejudice to the defendant, the court must consider less drastic alternatives before dismissing an indictment. See Lopez, 4 F.3d at 1464 (district court's dismissal of the indictment for ethical misconduct was an abuse of discretion because the defendant did not show prejudice, and the court did not consider lesser sanctions).

## Discussion

Mohr contends that the government violated the ethical rules prohibiting lawyers from communicating, or causing others to communicate with a person the lawyer knows to be represented by counsel regarding the subject of the representation. Oregon Rule of Professional Conduct ("ORPC") 4.2 states "a lawyer shall not communicate, or cause another to communicate on the subject of representation with a person the lawyer knows to be represented by a lawyer on that subject unless . . . authorized by law . . . ." Federal prosecutors must comply with state the rules of professional responsibility governing the state in which the prosecutor engages in the practice of law. 28 C.F.R. § 77.1(b), *implementing* 28 U.S.C. § 530B; 28 C.F.R. § 77.3.

Mohr points to two categories of contact that allegedly violated the ethical rules: (1) Agent Gino's contacts with Mohr regarding the ICE investigation and other stolen goods at Kwik Way Cash; and (2) the FBI informants' undercover buy/sell transactions at Kwik Way Cash, during which the informants deliberately elicited incriminating statements from him. Mohr argues these *ex parte* contacts violated the ethical rules because they occurred after Mohr notified the government that he had retained Shertz as counsel, after he told Agent Gino and AUSA Kerin that he did not wish to speak to the government except through counsel, and after

Mohr initiated proffer negotiations. I disagree.

The governments' conduct did not violate the ethical rules prohibiting *ex parte* communications with a represented party. There is no evidence that any of Agent Gino's contacts with Mohr were directed by anyone in the U.S. Attorney's office. In fact, there is no evidence that anyone in the U.S. Attorney's office was aware of the contacts. On two or more occasions, Mohr initiated the contacts with Agent Gino. By his own account, Mohr's conversations with Agent Gino were substantially related to the ICE's investigation, not the FBI's secondhand stores investigation. Any discussion of the secondhand case was incidental to the discussion of the ICE investigation. In sum, Agent Gino's conversations with Mohr did not violate the U.S. Attorney's ethical duty to avoid *ex parte* communications with a represented party because the contacts were neither directed by the U.S. Attorney, nor related to the secondhand stores investigation.

A prosecutor's duty to avoid *ex parte* contacts with a represented party does not generally apply to pre-indictment, non-custodial conversations between an undercover informant and a suspect. United States v. Powe, 9 F.3d 68, 69 (9th Cir. 1983); see also United States v. Lemonakis, 485 F.2d 941, 955-56 (D.C. Cir. 1973) (The communication "proscribed by the . . . Code of Professional Responsibility [] does not in our view embrace the initiation and recording of the conversations between [an informant] and [a defendant]" who is neither in custody, nor under indictment.). Here, the government had not yet charged, indicted, or arrested Mohr at the time FBI informants initiated and recorded the communications at issue. The U.S. Attorney's pre-indictment, non-custodial use of undercover informants to obtain evidence from a suspect does not implicate the ethical rules prohibiting *ex parte* communications with represented

parties. Cf. United States v. Kenny, 645 F.2d 1323, 1339 (9th Cir. 1981). The interpretation of the ethical rules advanced by Mohr would effectively preclude the use of undercover methods to investigate crimes. Such a rule would encourage persons engaged in criminal activity to obtain "house counsel" to insulate themselves from further investigation.

It is clear that during the course of supervising a criminal investigation, a prosecutor is "authorized by law" to employ legitimate undercover investigative techniques, which includes the use of informants to initiate and record conversations with a suspect in a pre-indictment, non-custodial situation. ORPC 4.2; Powe, 9 F.3d at 69; Kenny, 645 F.2d at 1339; United States v. Talao, 222 F.3d 1133, 1139 (9th Cir. 2000); see also United Stated v. Hammad, 858 F.2d 834, 839 (2d Cir. 1988) ("[U]nder [the rules of professional conduct], a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization.").

Mohr's claim that the government induced him to give up his constitutional rights is without merit. He cites no legal authority or factual basis for the proposition that a prosecutor must disclose the precise scope and full extent of an investigation prior to taking a suspect's proffer. Mohr's expectations regarding the government's investigation and the proffer are belied by the terms of the proffer agreement, which make clear that the government made no promise of consideration in exchange for the proffer. AUSA Kerin did not agree to abandon the investigation into Mohr's activities or the use of undercover informants by stating that Mohr was not the "focus" of the investigation and that "no attempts are being made to contact him." Cf. Powe, 9 F.3d at 70.

PAGE 8 - OPINION AND ORDER

Mohr argues that the initiation of proffer negotiations marked the commencement of adversarial proceedings, and that the government's use of undercover informants violated the ethical rule prohibiting *ex parte* contacts. I disagree. Such a rule would largely eviscerate one of the "most effective law enforcement techniques for investigating complex crime." Lopez, 4 F.3d at 1460. Indeed, a criminal suspect could effectively halt an ongoing undercover investigation, yet continue to engage in criminal activity, simply by initiating negotiations with a prosecutor.

Mohr's contention that the government's conduct violated his constitutional rights is without merit. The government did not violate his Fifth Amendment rights because there was no "custodial interrogation" in any of the contacts at issue here. Kenny, 645 at 1338. Mohr had no Sixth Amendment right to counsel at the time of the contacts because the government had not yet charged, arrested, or indicted him when Agent Gino and the FBI's informants contacted him. Kirby v. Illinois, 406 U.S. 682, 688 (1972). Mohr's initiation of proffer negotiations did not mark the beginning of adversarial judicial proceedings for Sixth Amendment purposes.

It should be noted that even if Mohr could demonstrate that the government's conduct violated the ethical rules, dismissal of the indictment would be improper because Mohr has wholly failed to show that he was "substantially prejudiced" by the alleged ethical violations. See Lopez, 4 F.3d at 1464 ("To justify such an extreme remedy [*i.e.*, dismissal of the indictment], the government's conduct must have caused substantial prejudice to the defendant and been flagrant in its disregard for the limits of professional conduct."). To the extent Mohr seeks to suppress statements made during the proffer session, the motion is moot. The terms of the proffer agreement prohibit the government's use of Mohr's proffer statements at trial.

The U.S. Attorney's use of undercover informants to initiate and record communications

with a suspect in a non-custodial setting, prior to arrest, charge, or indictment does not violate the ethical rules prohibiting *ex parte* communications with a represented party. Mohr has failed to demonstrate any violation of his constitutional rights. Thus, the motion to dismiss the indictment and the motion to suppress must be denied.

## Conclusion

For the reasons stated above, Mohr's motion (doc. 116) to dismiss the indictment for violation of ethical rules and constitutional rights, and his motion (doc. 144) to suppress statements made to government informants are DENIED.

IT IS SO ORDERED.

DATE this  13th  day of August, 2007.

/s/ James A. Redden
James A. Redden
Senior United States District Judge